BILLEY WINTERS,                    )
                                   )
                Plaintiff,         )
                                   )
vs.                                )    Case No. 4:09CV01370 AGF
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
                Defendant.         )

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Billey Winters' second request for review of an adverse decision by the Commissioner of Social Security denying his applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income under Title XVI of the Act, id. §§ 1381-1384f.  For the reasons set forth below, the decision of the Commissioner shall be reversed and the case remanded for further development of the medical record and a new decision.

## PROCEDURAL SUMMARY

Plaintiff, who was born on February 28, 1960, filed his applications for benefits on November 2, 2005, claiming a disability onset date of June 13, 2003, due to hepatitis C, bad knees, left hip problems, high blood pressure, carpal tunnel in both wrists, and

foot problems.[1]  He reported that he stopped working on September 4, 2005, at the age of

45, because of knee pain.  After his applications were denied at the initial administrative

level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  Such a

hearing was held on September 19, 2006.  Plaintiff and a vocational expert ("VE")

testified at the hearing.  By decision dated December 28, 2006, the ALJ found that

Plaintiff had engaged in substantial gainful activity through 2005, and that since then, he

could not perform his former work but had the residual functional capacity ("RFC") to

perform certain sedentary jobs identified by the VE as jobs someone with Plaintiff's

vocational profile and RFC could perform.  The ALJ concluded that thus, Plaintiff was

not disabled.  Plaintiff's request for review of the ALJ's decision by the Appeals Council

of the Social Security Administration was denied on July 11, 2007.

On September 25, 2008, this Court reversed and remanded Plaintiff's case to the

Commissioner for reconsideration.  Case No. 4:07CV1604 CAS (AGF) (Order adopting

Report & Recommendation of United Stated Magistrate Judge).  Plaintiff subsequently

amended his disability onset date to November 11, 2005.  On February 2, 2009, a new

evidentiary hearing was held before a different ALJ.  Plaintiff was the only witness.  On

March 26, 2009, the ALJ found that Plaintiff could perform light work with certain

---

[1]     The record indicates that Plaintiff previously had filed applications for disability
benefits on August 21, 2002.   These applications were denied at the initial administrative
level, and Plaintiff's late request for a hearing before an administrative law judge was
dismissed as untimely.  (Tr. 25.)  Plaintiff filed new applications on March 31, 2003; these
applications were denied initially on June 12, 2003, and Plaintiff did not seek further review.

limitations, and that based on the testimony of the VE at the first hearing, Plaintiff was

not disabled.  The Appeals Council denied Plaintiff's request for review on July 28, 2009.

Plaintiff has thus exhausted all administrative remedies and the ALJ's March 26, 2009

decision stands as the final agency action now under review.

Plaintiff argues that the ALJ committed reversible error in discrediting the

opinions of three of Plaintiff's physicians (Drs. Dale Furukawa, Bruce Bacon, and Robert

Poetz), assessing an RFC for which there was no medical basis, and discrediting

Plaintiff's allegations of disabling pain.

## <u>RECORD BEFORE THE COURT</u>

### <u>Medical Evidence from February 1996 to August 2006 (Tr. at 51-833)</u>

So that this Memorandum and Order is complete, the Court will recount the

medical evidence as set forth in the Court's decision of September 25, 2008.  The

transcript references remain the same.

> Plaintiff had two arthroscopic knee surgeries on his right knee and
> one on his left knee in a span of three years, from February 1996 to
> February 1999.  <u>Id.</u> at 143, 141, 150.  A liver biopsy performed on October
> 19, 1999, showed that Plaintiff suffered from chronic hepatitis C.  <u>Id.</u> at
> 190-91.  On May 29, 2001, Plaintiff underwent another operation on his
> right knee.  On a follow-up visit with David Andersen, M.D., on June 6,
> 2001, Plaintiff was cleared to return to his regular employment on June 16,
> 2001.  <u>Id.</u> at 168-70.

> Medical notes dated May 6, 2002, state that Plaintiff had completed
> 24 weeks of hepatitis C treatment, that Plaintiff complained of lack of
> motivation, that Zoloft (used to treat depression and anxiety) was helping
> him, but that he still had "bad days."  Plaintiff was "anxious to return to
> work."  He was released to work half-time and instructed to follow-up in
> two months.  <u>Id.</u> at 180-81.  On May 16, 2002, Charles Sincox, M.D.,

examined Plaintiff and reported that Plaintiff was 6' tall and weighed 237 pounds, had chronic hypertension, was undergoing interferon treatment for his hepatitis C, and was taking Zoloft. <u>Id.</u> at 764.

On October 2, 2002, Plaintiff presented to the ER with a complaint of left hip pain following a fall. It was noted that this hip had been surgically repaired previously after it had been shattered in a motor vehicle accident. An x-ray showed no bony abnormalities and that hardware (presumably from the previous surgery) was in place. Plaintiff was given pain medication and released. <u>Id.</u> at 249-50. Bruce Bacon, M.D., reported to Dr. Sincox by letter dated October 8, 2002, that Plaintiff's hepatitis virus was still present at the end of a 48-week treatment cycle, and that there were no new treatments to offer Plaintiff at that time. <u>Id.</u> at 229.

On January 16, 2003, Plaintiff saw Dr. Sincox, complaining of recent severe headaches and periodic blackouts. <u>Id.</u> at 762. Dr. Sincox referred Plaintiff to a neurologist who examined Plaintiff on February 7, 2003, for "transient alterations of awareness" and reported to Dr. Sincox that the problem might be due to migraines rather than epilepsy. <u>Id.</u> at 241-42.

On questionnaires completed on March 24, 2003, in connection with his application for disability benefits, Plaintiff wrote that he had sharp pains in his knees, aching pains in his left hip, and severe headaches, was extremely tired all the time from his hepatitis C, and was withdrawn from people. His medications included Topamax (an anticonvulsant used to treat migraines), Hydrocodone, Diovan (for hypertension), and Xanax (for anxiety). <u>Id.</u> at 35, 37-40. On the same date, Plaintiff's wife completed a Daily Activities Questionnaire about Plaintiff, in which she stated that Plaintiff had no energy, and was withdrawn, very moody, and always complaining about pain in his joints. <u>Id.</u> at 36.

On March 19, 2003, Plaintiff underwent another arthroscopic procedure to repair a medial meniscus tear in his right knee, and a similar procedure on his left knee on April 30, 2003. Meanwhile, on April 16, 2003, Andrew Matera, M.D., a non-examining state agency physician, completed a Physical RFC Assessment form, indicating that Plaintiff could occasionally lift a maximum of 50 pounds and frequently lift a maximum of 25 pounds; stand for six out of eight hours; sit for six out of eight hours; push and/or pull without limitation; and occasionally climb stairs/ramps, balance, stoop, kneel, and crouch, but never climb a ladder or crawl.

Plaintiff had no manipulative, visual, or communicative limitations, but had to avoid concentrated exposure to extreme cold or heat, vibration, and fumes, and moderate exposure to hazards.  Id. at 55-62, 77.

Plaintiff saw Joseph Williams, M.D., an orthopedist, on May 21, 2003, for an evaluation of his right knee pain.  Dr. Williams noted that Plaintiff's past medical history included hypertension, hepatitis C, depression, panic attacks, a seizure disorder, and bilateral carpal tunnel syndrome.  Dr. Williams believed that Plaintiff was too overweight and too young to be a good candidate for knee replacement, and he recommended continuing conservative treatment.  Id. at 773-74.  On May 27, 2003, Dr. Sincox diagnosed degenerative arthritis in the right knee, and prescribed Hydrocodone for associated pain.  Id. at 760.

On June 11, 2003, psychologist Stanley Hutson, Ph.D., a non-examining state agency consultant, completed a Mental RFC Assessment form and a Psychiatric Review Technique form.  Dr. Hutson indicated in the Mental Assessment that Plaintiff was moderately limited in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption from psychological symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  Dr. Hutson wrote in narrative form as follows:

> Plaintiff had depression and fatigue, social withdrawal, and cognitive deficits.  He has mild to moderate limitations in concentration, persistence, and pace.  He also has mild to moderate limitations in dealing with the public, coworkers and supervisors, and tends to withdraw and be hard to communicate with.  He has difficulty coping with all of the physical problems and would have frequent upsets in dealing with changes and demands in a work setting.

Id. at 51-52, 65-66.

On the Psychiatric Review Technique form Dr. Hutson indicated that Plaintiff had an affective disorder, a personality disorder, and a

substance addiction disorder (alcohol, in remission), all of which resulted in mild limitations in activities of daily living, and moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace. Referring to the Physical RFC, Dr. Hutson noted that Plaintiff had multiple physical problems and side effects from treatment. He opined that Plaintiff's personality disorder "did not appear to cause severe limitations for work by history," and that the limitations caused by Plaintiff's depression were "severe" but did not meet or equal the severity of a deemed-disabling mental impairment listed in the Commissioner's regulations. Id. at 63-64, 53-54, 67-76.

On June 28, 2003, Plaintiff went to the ER complaining of chest pain. It was noted that Plaintiff had a panic disorder for which he was taking Zoloft, but no history of cardiac problems. An EKG and other diagnostic tests were normal, and Plaintiff's chest pain was determined to likely be due to his panic disorder. Plaintiff's Zoloft prescription was increased and he was discharged that same day. Id. at 767-69. On August 22, 2003, Plaintiff presented to the ER with abdominal pain. He was given Percocet (Oxycodone) and morphine, diagnosed with diverticulitis, and discharged later that day after the pain subsided. Id. at 709-15, 765.

On February 24, 2004, Plaintiff saw Dr. Williams for right knee pain, and on March 1, 2004, Dr. Williams performed arthroscopic surgery on the knee. Dr. Williams wrote a note advising that Plaintiff would be unable to work until March 15, 2004. Id. at 790-94. At a postoperative visit on March 18, 2004, Dr. Williams noted that the wound looked good, and that Plaintiff had no problems and minimal pain. Id. at 788-89.

By mid-May 2004, Dr. Furukawa was Plaintiff's primary care physician. On May 17, 2004, Plaintiff saw Brian Smith, M.D., at a pain management clinic, upon referral by Dr. Furukawa. Plaintiff complained of severe pain in his right knee, and less severe pain in his left hip and knee. According to Dr. Smith, Plaintiff reported on an Oswestry pain questionnaire[2] that he needed some help in personal care, that lifting heavy items aggravated his pain, that he was able to sit in a chair as long as he liked, that he was unable to stand more than one hour or walk more than 1/4

---

[2]    The Oswestry test rates an individual's perception of his functional limitation related to lower back pain. Scores of 10% to 20% reflect minimal disability; scores of 20% to 40% reflect moderate disability; and scores of 40% to 60% reflect severe disability.

mile, and that he "could travel anywhere without pain." Dr. Smith observed that Plaintiff (who was 6' tall and weighed 284 pounds) had a brace on his right knee and walked with a right-sided limp. Plaintiff did not appear to be in acute distress, his affect was normal, and he did not appear depressed or unduly anxious. Dr. Smith assessed an Oswestry Pain Disability Score of 17/50 ( 34%) (indicating moderate disability), and started Plaintiff on Avinza (sustain-release morphine), Zanaflex (for muscle spasms), and Naprosyn (for pain). Id. at 532-34.

Between May 29 and June 6, 2004, Plaintiff went to the Emergency Room ("ER") three times for right knee pain, abdominal pain, and back pain. On each visit, Plaintiff was given medication and released. Id. at 591, 700, 693. Meanwhile, Plaintiff continued to see Dr. Smith monthly for pain management. At the June 14, 2004 visit, Plaintiff reported 75% ("near complete") relief from the pain medications Dr. Smith had prescribed. Id. at 53-31. On July 19, 2004, Plaintiff told Dr. Smith that he had good pain control with his medications, but that he was depressed and thought this might be due to the medications. Dr. Smith again noted that Plaintiff's right knee was braced and that he walked with a right-sided limp. Noting that Plaintiff appeared depressed and was on an antidepressant prescribed by Dr. Furukawa, Dr. Smith switched Plaintiff from Avinza to Duragesic; after Plaintiff reported at his next visit (on August 18, 2004) that his pain control was not as good, Dr. Smith prescribed a generic MS Contin (oral morphine). Id. at 526-29.

On September 9, 2004, Plaintiff reported that his pain medications were providing 80% relief, and Dr. Smith prescribed MSIR (oral morphine) in addition to the MS Contin for "breakthrough pain" Plaintiff was experiencing at the end of his workday, and told Plaintiff to return in two months. Id. at 524-25. Plaintiff next saw Dr. Smith on December 1, 2004. The progress notes again state that Plaintiff reported 80% pain relief from his medications, which Dr. Smith continued. Id. at 522-23.

By letter dated January 17, 2005, Dr. Bacon wrote to Dr. Sincox that Plaintiff was seen for follow-up with regard to his hepatitis C, which had relapsed at the end of 48 weeks of treatment. Dr. Bacon said that Plaintiff was doing well and had no complaints relating to that illness. Dr. Bacon noted that at the time there were no new treatments to offer Plaintiff, but that studies were being conducted for patients who had relapsed, and that Plaintiff was told to return in six months. Id. at 731.

Plaintiff saw Dr. Smith on February 16 and March 16, 2005, for continued pain management. At his visit in February, Plaintiff was tapered off his MS Contin, because it was making him too drowsy. Id. at 520-21. However, at his March visit, Plaintiff reported that he did not have adequate pain control, and MS Contin was restarted at a lower dose. Id. at 519. On March 23, 2005, Plaintiff saw W. Chris Kostman, M.D., an orthopedist, to evaluate treatment options for his right knee. Dr. Kostman noted that Plaintiff had exhausted many available non-surgery options including injections, physical therapy, and bracing. Dr. Kostman felt that it would be best if further knee surgery could be put off for five to ten years, and recommended weight loss at this point, which Dr. Kostman believed might improve Plaintiff's symptoms "significantly." Id. at 622-23.

On April 13, 2005, Plaintiff reported to Dr. Smith that his pain was unchanged since his last visit. Plaintiff described his pain, which he experienced mostly in the afternoon and evening, as shooting, throbbing, and sharp, and reported that he had to use "a reasonable amount" of breakthrough medication. Nevertheless, the progress notes repeat the entry that Plaintiff felt 80% and "near complete" relief from his medications. Id. at 516-17. On May 11, 2005, Dr. Smith continued Plaintiff on MS Contin and MSIR, which were giving Plaintiff "reasonable control" of his pain. Id. at 514-15.

On June 29, 2005, Dr. Kostman gave Plaintiff a cortocosteroid injection for his right knee, and opined that Plaintiff's right knee would most likely require a total knee arthroplasty because of involvement of both the medial joint line and the patellofemoral joint. Id. at 621. Plaintiff saw Dr. [Robert] Poetz on July 15, 2005, for evaluation of work-related injuries occurring on January 18, 2003. Upon physical examination and a review of Plaintiff's past medical history, Dr. Poetz concluded that Plaintiff had a 40% permanent disability to the right knee, pre-existing; 35% permanent disability to the right knee due to the injury of January 18, 2003; 25% permanent disability to the left knee, pre-existing; 33% permanent disability to the left knee due to the injury of January 18, 2003; 40% permanent disability to the left hip; 15% permanent disability to the left wrist; 35% permanent disability to the left hand and wrist; 40% permanent disability to the right hand and wrist; and 15% permanent disability to the body as a whole due to hepatitis. Dr. Poetz further opined that the combination of these disabilities resulted in a total that "exceeds the simple sum by 20%," and that Plaintiff was permanently and totally disabled, and would remain permanently and totally unemployable. Id. at 657-64.

Plaintiff saw Dr. Smith on August 10, September 7, September 12, and October 5, 2005, for continued pain management. At the September 7 visit, Dr. Smith switched Plaintiff to OxyContin, and at the October 5 visit, Dr. Smith instructed Plaintiff to return in three months for further evaluation. Id. at 506-10. On October 19, 2005, Plaintiff saw Dr. Kostman again, who noted that x-rays revealed varus deformity that might respond well to a high tibial osteotomy (surgery in which the bone is cut and then realigned) and such a procedure was scheduled. Id. at 620.

On December 15, 2005, Dr. Bacon wrote to Dr. Furukawa with an update similar to the one sent to Dr. Sincox on January 17, 2004, namely that Plaintiff was "doing fairly well," with his hepatitis C and that no new treatments were available. Id. at 468.

Also on December 15, 2005, non-examining consultant A. Carwile[3] completed a Physical RFC Assessment form covering the period of November 1, 2005, to the date of the assessment. The form indicates that Plaintiff could lift and/or carry a maximum of ten pounds; stand for six out of eight hours; sit for six out of eight hours; push and/or pull without limitation; and occasionally climb stairs/ramps, kneel, crouch, and crawl; but could never climb ladders, ropes, or scaffolds. Plaintiff had no manipulative, visual, or communicative limitations, but had to avoid concentrated exposure to vibration and hazards, such as machinery and heights. It was believed that Plaintiff's allegations that he did could not walk more than 50 feet or stand longer than one and one-half hours (at a time) were consistent with the medical evidence on file and were credible. Id. at 406-13.

Plaintiff saw Dr. Smith again on December 28, 2005, at which time Dr. Smith continued current medications and added Percocet. Id. at 503-04. Plaintiff went to the ER on December 30, 2005, and January 4, 2006, presenting with abdominal pain on both occasions. X-rays showed that Plaintiff was suffering from diverticulitis. Plaintiff was prescribed an antibiotic and told to take his prescribed pain relievers. Id. at 570-71.

On January 12, 2006, Plaintiff voluntarily admitted himself to a hospital for depression and opioid dependency. At admission, Plaintiff was

---

[3]     The typed name "A. Carwile" (without "M.D." or "D.O.") appears in the space for the signature of a medical consultant.

diagnosed with major depressive disorder, opioid dependency, and a Global Assessment of Functioning ("GAF") of 25.[4]  Id. at 543-44.  The date of discharge is not reflected in the record, but on January 24, 2006, Plaintiff presented to the hospital again due to an increase in depressive symptoms. He was admitted to the hospital with a diagnosis of major depressive disorder and a GAF score of 37.  The intake assessment noted that Plaintiff had not worked since November 11, 2005, when he went on medical leave, and that he lived with his wife of 15 years and their three teenage sons. Plaintiff was discharged on January 28, 2006, on antidepressant medication, and was instructed to follow-up with his primary care physician.  Upon discharge, Plaintiff's GAF was 50.  Id. at 536-44.

Plaintiff saw Dr. Smith on January 30, 2006, and expressed his desire to stop taking OxyContin.  Plaintiff reported that he had tried to stop abruptly and had developed withdrawal symptoms.  Dr. Smith told Plaintiff that he would need to taper off use of the drug over a period of several months.  Id. at 501-02.  Plaintiff saw Dr. Smith on February 27, March 23, and April 20, 2006, for continued treatment of his pain management with relatively little change in his treatment.  Id. at 495-500.

On May 31, 2006, Plaintiff met with vocational rehabilitation counselor Timothy Lalk, who issued a Vocational Rehabilitation Evaluation on July 7, 2006.  Mr. Lalk noted that Plaintiff appeared tired and sad throughout the interview.  Based upon the interview, and his rather extensive review of Plaintiff's medical records, Mr. Lalk opined that Plaintiff was credible and that Plaintiff would not be able to secure and maintain any type of full-time work, even at the sedentary level or at a job that would permit him to sit and stand throughout the workday.  Mr. Lalk did not believe that any employer would hire Plaintiff due to his mood and

_____

[4]  A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  GAF scores of 21-30 reflect behavior that is "considerably influenced" by delusions, hallucinations, serious impairment in communication or judgment, or an inability to function in almost all areas; scores of 31-40 indicate "some" impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32-4.

appearance of fatigue, of being under strain, and of experiencing discomfort when walking, standing, and changing positions. Id. at 480-93.[5]

On a Physician's Assessment form dated July 14, 2006, Dr. Bacon stated that Plaintiff suffered from chronic hepatitis C, with symptoms including chronic fatigue, and aches and pains. Dr. Bacon opined that Plaintiff's symptoms might restrict his daily activities and his ability to do sustained work-related activities such as prolonged sitting, standing, walking, and lifting objects in excess of five pounds; and maintaining attention and concentration, and dealing with ordinary work stresses, on a day-in and day-out basis. Dr. Bacon further opined that Plaintiff would probably need to rest four to five times for 15 to 30 minutes each time, during an eight hour work day. Dr. Bacon opined that Plaintiff "might be able to work a sedentary level job," but that his "abilities were significantly limited in being able to work more than a sedentary job." Id. at 467.

Also on July 14, 2006, Dr. Furukawa, Plaintiff's primary care provider for over two years, completed an assessment form stating that Plaintiff suffered from chondromalacia (anterior knee pain) and degenerative joint disease in his right knee, with symptoms of constant pain, decreased range of motion, stiffness, crepitation, and swelling of the knee. Dr. Furukawa opined that Plaintiff's symptoms restricted his ability to sustain work-related functions such as sitting, standing, and stooping, and that Plaintiff was unable to perform sedentary work, due to his constant pain. Id. at 449.

Plaintiff saw Dr. Furukawa on August 4, 2006, for follow-up. In a letter "To Whom It May Concern," Dr. Furukawa stated that Plaintiff continued "to have ongoing issues with pain and weakness and decreased motion on his knees" despite treatment with medications, exercise and strengthening regiments, and that he (Dr. Furukawa) did not see any hope for Plaintiff to improve in the future. Id. at 447.

---

[5] Mr. Lalk refers to an evaluation of Plaintiff conducted on July 13, 2005, by a Dr. Ralph, who believed that Plaintiff could work without restrictions, except perhaps at repetitive tasks. The record before the Court does not contain such a report, nor did the ALJ or either party refer to it.

<u>**Evidentiary Hearing of September 19, 2006 (Tr. at 838-61)**</u>

So that this Memorandum and Order is complete, the Court will recount

the summary of the evidentiary hearing as set forth in the Court's decision of

September 25, 2008. Again, the transcript references remain the same.

Plaintiff testified that he was 46 years old, had a GED, and had
worked as an assembly line worker at an automotive plant, a painter of
office furniture, a truck spotter driving trucks into dock doors, and a laborer
installing swimming pools. Plaintiff acknowledged that although he had
alleged a disability onset date of June 13, 2003, he had annual earnings of a
little over $30,000 in each of 2003, 2004, and 2005. Plaintiff's counsel
explained that June 13, 2003, was the date after "a prior appeal denial," and
that "a lot" of the taxable wages shown on payroll records represented sick
leave. Counsel posited that the earnings after June 13, 2003, were either
less than the amount constituting SGA, or represented unsuccessful work
attempts.

Plaintiff testified that he had had a substance addiction, "mainly
alcohol," in the past, but that he had not had a drink in the six or seven
years since his stay at a treatment facility. Upon further questioning by the
ALJ, Plaintiff also acknowledged that he had been hospitalized within the
past year for opioid (Oxycontin) dependence. He testified that he had been
scheduled to get a partial knee replacement in December 2005, but the
surgery was cancelled because his insurance would not cover it. He stated
that he had a pending workers' compensation claim that involved a 2003
work-related injury to his right knee.

Plaintiff reported that he currently experienced "a lot of pain" in his
right knee, "a lot of popping, locking up, swelling, real sharp pain." He
also had pain and tightening in his left hip, fatigue due to hepatitis, and
headaches if he did not take his blood pressure medication. Plaintiff
testified that even on medication, his blood pressure was still "borderline
high."

Plaintiff testified that he had not been at what he considered to be his
normal weight of 250 to 260 since 1998 or 1999, and that his extra weight
did not cause any difficulties that he knew of with his knees. Plaintiff
noted that he had pain in his lower back when he sat for long periods of

time. He also testified that he was "still depressed all the time, withdrawn," for which he was taking prescribed medications. He stated, however, that since he left the hospital (on January 28, 2006), he had not followed up with a psychiatrist or psychologist.

Upon questioning by his counsel, Plaintiff testified that during his last two years of work (1993-1995), his co-workers would allow him to take the easiest jobs in the plant because they knew his "condition," and that at those jobs, he would sit for about one-third of the day. He testified that he drove about three times a week, and that the longest distance he drove without a break was 40 to 45 miles. He could walk a couple of city blocks without a break, stand for about one-half hour before his knees and hips began to hurt, sit for about one-half hour at a time, and lift and carry ten pounds. Plaintiff testified that he rarely climbed stairs, bent, or stooped.

Plaintiff testified that a normal day consisted of waking up at about 11:00 a.m. to noon, watching television in bed for a couple of hours, and then going into the front room to watch more television. He only took brief showers, went to bed around midnight to 1:00 a.m., and only got about four or five hours of sleep a night because of pain, discomfort, and "sleeplessness." Plaintiff testified that he did not do household chores and that he napped frequently. On a scale of one to ten, he rated his right knee pain as a six to seven with medication, and an eight to eight and one-half after activity; his left hip pain as a five to five and one-half when doing nothing, and a six to six and one-half after activity; and his lower back pain as a six.

The ALJ posed two hypothetical questions to the VE, based on the RFC assessments of "the state doctors." The VE was first asked to assume an individual with the same vocational factors as Plaintiff (age, education, work experience), who could lift and carry 50 pounds occasionally and 25 pounds frequently; sit for six hours out of eight; stand or walk for six hours out of eight; and occasionally climb stairs, balance, stoop, crouch, and kneel; could never crawl or climb ropes, ladders, or scaffolds; should avoid concentrated exposure to extreme cold and heat, vibration, fumes, and odors; should avoid moderate exposure to the hazards of moving and dangerous machinery and unprotected heights; was able to understand, remember and carry out at least simple instructions on non-detailed tasks and respond appropriately to supervisors and co-workers in a task-oriented setting; could only tolerate infrequent contact with others; and could adapt

to routine, simple work changes.[6]  The VE was asked whether this person could perform any of Plaintiff's past relevant work, and the VE testified that he did not think so. The VE testified, however, that such a person could perform other jobs, such as cashiering (light work) and some assembly work (light, unskilled work), both of which existed in significant numbers locally and nationally.

The ALJ next asked the VE to assume a second hypothetical individual who could lift ten pounds occasionally; sit for six hours out of eight; stand or walk for six hours out of eight; occasionally climb stairs, but never ropes, ladders, or scaffolds; could occasionally crouch, kneel, and crawl; should avoid concentrated exposure to vibration, and the hazards of moving dangerous machinery; and had "the same psychological restrictions as in the previous hypothetical."[7]  The VE testified that such a person could perform sedentary jobs,[8] giving the examples of lampshade assembler, order clerk, and food and beverage worker, all of which existed in significant

---

[6]    The physical capacities in this hypothetical match those in the April 16, 2003 physical RFC assessment of Dr. Matera.  (Tr. at 55-62.)

[7]    The physical capacities in this hypothetical match those in the December 15, 2005 physical RFC assessment of A. Carwile.  (Tr. at 406-13.)

[8]    Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

"Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of an 8-hour workday. . . .  In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals.

Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *3, 6 (July 2, 1996).

numbers locally and nationally. The VE further testified that adding the need for a sit/stand option would preclude only a small percentage of these jobs.

Plaintiff's counsel asked the VE to assume a hypothetical individual with Plaintiff's vocational factors who was able to walk a maximum of two blocks/30 minutes, sit for 30 minutes, and lift ten to 15 pounds occasionally; experienced "a significant degree of chronic pain" despite medication, which "at least at significant times" would interfere with attention and concentration; and experienced chronic fatigue, which required frequent rest periods at will at any time throughout the day. The VE testified that there were no jobs such an individual could maintain.

## Medical Records Following Remand (Tr. at 1079-1213)

The record contains progress notes from follow-up visits with Dr. Furukawa occurring on an approximately monthly basis from August 4, 2006, through January 16, 2008. These notes often, but not always, reference knee pain, swelling, and crepitus. The notes are in check-box format, and added handwritten comments that are somewhat illegible. In a section labeled "Review of Symptoms," the forms indicate that a given system is normal if checked; on almost all forms, the musculoskeletal system is not checked. Id. at 1147-71.

On April 20, 2006, Plaintiff met with Dr. Smith, complaining of right knee and hip pain. Plaintiff rated the pain as unchanged, and described it as "shooting, sharp, electric shock, pain" that occurred "mostly in the afternoon, mostly in the evening." Plaintiff indicated that the procedure performed on his last office visit provided 80% relief which was "near complete" and "persistent." He further asserted that the medications he was treated with at the previous office visit

provided 80% relief that he felt was "near complete" and "persistent." Plaintiff reported being "pleased" with the amount of analgesia he was receiving. In evaluating Plaintiff's musculoskeletal system, Dr. Smith indicated that "[m]uscle strength testing is 5/5 and equal bilaterally with resistence to flexion and extension in all planes of the lower extremities." With respect to Plaintiff's neuromuscular system, Dr. Smith observed, "The patient has a right-sided limp. There is crepitus present in the right knee with flexion and extension of the joint." Dr. Smith assessed degenerative joint disease with severe pain in the right knee, and gave Plaintiff refills for OxyContin and Percocet. Id. at 1195-96.

At a follow-up visit with Dr. Smith on June 21, 2006, Plaintiff complained of bilateral knee pain, with the right knee being worse than the left, and hip pain. Plaintiff rated the pain as "unchanged" and described it as "throbbing, sharp, electric shock, pain" that occurred "mostly in the afternoon, mostly in the evening." Plaintiff indicated that the medications he was treated with at the previous office visit provided 80% relief, and he felt that the relief was "near complete but temporary." Plaintiff reported some next-day sedation with use of Ambien. In evaluating Plaintiff's musculoskeletal system, Dr. Smith indicated that "[m]uscle strength testing is 5/5 and equal bilaterally with resistence to flexion and extension in all planes of the lower extremities." With respect to Plaintiff's neuromuscular system, Dr. Smith observed, "The patient has a right-sided limp. Crepitance is present in the right knee with flexion and extension of the joint." Dr.

Smith assessed degenerative joint disease and pain of the right knee, and gave Plaintiff refills for OxyContin and Percocet. Id. at 1193-94.

At a follow-up visit with Dr. Smith on September 21, 2006, Plaintiff complained of bilateral knee pain and intermittent left hip pain. He asserted that the pain was unchanged, and described it as "shooting, throbbing, sharp, pain" that occurred "mostly in the afternoon, mostly in the evening." Plaintiff indicated that the medications provided at the previous office visit provided 80% relief, and asserted that the relief was "near complete" and "persistent." Dr. Smith indicated that "[m]uscle strength testing is 5/5 and equal bilaterally with resistence to flexion and extension in all planes of the lower extremities." In evaluating Plaintiff's neuromuscular system, Dr. Smith noted, "The patient has a right-sided limp. Crepitance is present in the right knee with flexion and extension of the joint." Dr. Smith assessed degenerative joint disease of the right knee with severe right knee pain, and gave Plaintiff a prescription for OxyContin and Percocet. Id. at 1191-92.

At a follow-up visit with Dr. Smith on November 16, 2006, Plaintiff complained of knee pain. He rated the pain levels as "unchanged" and described the pain as "shooting, throbbing, sharp, pain" that occurred "mostly in the afternoon, mostly in the evening." Plaintiff reported 80% relief with the use of OxyContin and Percocet, and denied side effects from these medications. Dr. Smith noted that Plaintiff had a right-sided limp, and observed crepitance with both flexion and extension of the right knee joints. Dr. Smith assessed

degenerative joint disease with severe knee pain in the right knee. He refilled Plaintiff's prescriptions for OxyContin and Percocet, and provided samples of Lidoderm. Id. at 1189-90.

At a follow-up visit with Dr. Smith on January 8, 2007, Plaintiff complained of hip and knee pain that he described as "sharp" and "shooting" and rated as "unchanged." Plaintiff indicated that the timing of the pain was "mostly in the afternoon, mostly in the evening." Plaintiff reported 80% relief from the medications prescribed at the previous appointment, specifically Oxycontin and Percocet, and indicated that he felt the relief was near complete and was persistent, and that he experienced no side effects. Plaintiff maintained that his pain levels were manageable, and denied complications with his medications. Plaintiff told Dr. Smith that he continued to experience insomnia, even though he used Ambien, asserting that he could fall asleep but could only stay asleep for approximately 15-20 minutes before waking up. Dr. Smith refilled Plaintiff's prescriptions for OxyContin and Percocet and gave Plaintiff a new prescription for Seroquel. Id. at 1187.

At an office visit with Dr. Smith on February 19, 2007, Plaintiff complained of pain, but indicated that his current pain was "better." He described the pain as "throbbing, sharp, electric shock pain," and indicated that the timing was "mostly in the afternoon, mostly in the evening." Plaintiff reported that the medications from his last office visit provided 80% relief, and indicated that he felt

that the relief was near complete and persistent. Plaintiff further reported experiencing certain side effects, specifically nausea and constipation. At this appointment, Plaintiff admitted that he directly violated his narcotic agreement; he indicated that he had been receiving additional medication, specifically Vicodin, from other physicians in quantities of up to 360 tablets per month. He further admitted that he had misused Percocet and OxyContin. Plaintiff told Dr. Smith that he wanted to enter drug rehabilitation and discontinue all of his medications. Plaintiff stated that for several years, he had experienced worsening depression, inability to work, and lack of social involvement, and he attributed these issues to inappropriate medication use. Dr. Smith discontinued all short-acting medications including both Percocet and Vicodin, and recommended continuing with OxyContin until Plaintiff's remaining supply (approximately thirty 20 mg tablets) was depleted. Id. at 1185-86.

At a meeting with Dr. Smith on March 1, 2007, Plaintiff complained of "worse" right knee pain that he characterized as "shooting, throbbing, sharp, electric shock, pain." He indicated that he felt the pain mostly in the evening. Plaintiff indicated that the medications prescribed at the previous visit provided 80% relief, and that the relief was near complete and persistent. Plaintiff told Dr. Smith that while he was able to stop his Oxycontin use through a detoxification center, he was experiencing a significant amount of knee pain and had followed up with an orthopedic surgeon, who would schedule him for a total knee replacement.

Dr. Smith indicated that he would no longer prescribe any pain medications for Plaintiff, and noted that he did not schedule nor anticipate any follow-up appointments. Id. at 1184.

Plaintiff saw W. Chris Kostman, M.D., an orthopedist, on March 16, 2007, for evaluation of his right knee pain. Dr. Kostman observed that Plaintiff presented with primarily right knee medial joint line tenderness, but without a significant amount of patellofemoral or lateral joint line tenderness. Dr. Kostman noted some diffuse swelling of Plaintiff's bilateral lower extremities, which Plaintiff attributed to his liver disease. Plaintiff's range of motion was from 0 to approximately 125° of flexion, and he had no varus or valgus instability. Dr. Kostman reviewed imaging studies, which demonstrated medial joint line loss of articular height templated to be approximately a 7° correction for a neutral position and approximately 7-10° for a valgus position. He also reviewed an MRI scan,[9] which demonstrated some increased signal in the proximal tibia consistent with a bone infarct, as well as cartilaginous defects in the medial compartment, which would be consistent with degenerative arthritis and post-meniscectomy changes of the medial meniscus. Plaintiff expressed interest in an operative intervention, such as high tibial osteotomy following arthroscopy. Dr. Kostman discussed the

_____

[9] The MRI was performed on March 15, 2007. The radiologist and Dr. Kostman reached similar conclusions. Id. at 1144.

potential benefits and possible risks of such an operation, including the potential for failure of the surgery if Plaintiff did not quit smoking.  Id. at 1139.

On March 19, 2007, Dr. Kostman and Timothy Farley, M.D., another orthopedist, performed a right knee high tibial osteotomy followed by right knee arthroscopy, chondroplasty medial femoral condyle on Plaintiff.  Id. at 1140-41.

At a follow-up visit on April 3, 2007, Dr. Kostman noted that Plaintiff had been working with his continuous passive motion ("CPM") machine and had begun his physical therapy.  Plaintiff reported some increased swelling in his lower leg and indicated that he had some calf discomfort, but asserted that he had normal strength and sensation within his foot.  Dr. Kostman observed that the incisions from the right knee high tibial osteotomy were well-healed with no signs of infection.  He noted some lower extremity swelling and edema within Plaintiff's foot, with some tenderness to deep palpitation within his calf.  Dr. Kostman observed that, "Motion today is from 5° to 90°."  Dr. Kostman expressed concern that Plaintiff might have a DVT within his right lower extremity, and sent him to obtain a Doppler ultrasound.  If the ultrasound proved positive for DVT, Dr. Kostman recommended admitting Plaintiff and consulting his internist for anticoagulation; if the ultrasound proved negative, Dr. Kostman recommended fitting Plaintiff for Ted hose to wear for a few weeks to decrease the leg swelling. Id. at 1138.  The venous Doppler ultrasound, performed April 3, 2007, showed no evidence of DVT.  Id. at 1143.

At a follow-up visit on April 18, 2007, Dr. Kostman observed that Plaintiff seemed to be doing well after his right knee tibial osteotomy. Dr. Kostman noted that Plaintiff, who remained non-weight-bearing on his right side, used a bone stimulator nine hours per day and a CPM device for four hours per day, in addition to going for physical therapy. Radiographic analysis of the right knee indicated that the hardware was in the right place, but did not reveal any significant bony healing. Upon physical examination, Dr. Kostman determined that Plaintiff had a range of motion in his knee from full extension to 95°, that the incisions were well healed with no signs of infection, and that the site was neurovascularly intact. Dr. Kostman recommended that Plaintiff continue attending physical therapy and using the bone stimulator for nine hours per day. Id. at 1137.

On May 16, 2007, Dr. Kostman determined that Plaintiff had from 0° to 134° of flexion of both knees, with no instability or tenderness to palpitation along his right tibia, but with some medial incision and joint line tenderness of his right knee. Dr. Kostman noted that Plaintiff continued to smoke. He recommended Plaintiff continue using his bone stimulator, and estimated that Plaintiff's total healing time for his bone graft to be approximately 12 weeks from the time of surgery. Id. at 1136.

An x-ray of the right knee on June 6, 2007, revealed progressive healing of the right high tibial osteotomy, but it did not appear to be fully healed yet. Dr. Kostman noted that Plaintiff had been using crutches and using a bone stimulator.

Upon physical examination, Dr. Kostman noted that Plaintiff had some swelling in his knee but no erythema or redness, and that Plaintiff had full extension to 110° of flexion. Dr. Kostman expressed his belief that Plaintiff was still healing from his right knee high tibial osteotomy, and recommended continued use of a bone stimulator for at least another four weeks. He also recommended quitting smoking; Plaintiff understood and agreed to try, but indicated that he was having a hard time quitting. Id. at 1135.

At a June 25, 2007, meeting with Dr. Smith, Plaintiff reported constant, throbbing, sharp right knee pain that he rated as unchanged from his previous visit. Plaintiff indicated that the medications provided on the previous visit provided 80% relief that he felt was near complete and persistent. Plaintiff asserted that while he was making gradual improvement after his high tibial osteotomy, he was still experiencing a significant amount of right knee pain. Dr. Smith prescribed Ultram for use pro re nata and Celebrex for use on a scheduled basis, but instructed Plaintiff to check with his hepatologist to make sure he could take Celebrex. Dr. Smith noted that he had not prescribed narcotic analgesics for Plaintiff since the point when it was found that Plaintiff was obtaining narcotics from multiple physicians. Id. at 1181-82.

In a letter addressed "To Whom It May Concern" dated October 16, 2007, Dr. Furukawa pointed to Plaintiff's orthopedic procedures and injuries, acetabular fracture with internal fixation, and bilateral carpal tunnel syndrome, as well as his

visits to orthopedic specialists over the course of several years, and expressed his opinion that, given Plaintiff's assortment of ailments, Plaintiff was "completely and permanently disabled in terms of gainful employment." Id. at 1146.

On January 22, 2008, Plaintiff reported continued soreness in his right knee that had not significantly improved over the preceding months. He had a range of motion from 0 to approximately 120° of flexion. Dr. Kostman and Dr. Farley recommended a CT scan and potentially a tomogram of the proximal tibia. Id. at 1134.

When Dr. Furukawa retired, he referred Plaintiff to Manish Suthar, M.D., a pain prevention and rehabilitation specialist, who, at his initial meeting with Plaintiff on February 6, 2008, prescribed Percocet, directing Plaintiff to follow up on a monthly basis for refills. Id. at 1130.

On March 4, 2008, Plaintiff drove three hours in a snowstorm to get his medications from Dr. Suthar's office. Dr. Suthar suggested hyaluronic treatment, specifically Supartz injections, to help delay further onset of worsening degenerative arthritis in Plaintiff's left knee. Id. at 1128.

On March 12, 2008, Plaintiff reported to Dr. Kostman that he had some continued right knee discomfort. Plaintiff had not been able to discontinue smoking and decided not to get a CT scan of his knee; Dr. Kostman again recommended that Plaintiff discontinue all smoking and obtain a CT scan of the osteotomy site.

On March 13, 2008, Plaintiff had an initial meeting with David A. Miller, M.D., a family care physician, at which he complained of continuing knee pain and asked for medication refills. Plaintiff reported that he had never seen a pain specialist. Dr. Miller noted that Plaintiff's gait and station were "normal." Dr. Miller gave refills for Avalide, Metoprolo, Cymbalta, Percocet, and Xanax. Dr. Miller also referred Plaintiff to a pain center. Id. at 1115.

On March 31, 2008, Nicole James, a physician assistant in Dr. Suthar's office, continued Plaintiff's prescriptions. Id. at 1127. On April 28, 2008, Dr. Suthar continued Plaintiff's Percocet with no refills, indicated that Plaintiff should schedule Supartz injections for the left knee, and instructed Plaintiff to see about a replacement for a brace that had provided relief but fallen apart. Id. at 1126.

On April 29, 2008, Dr. Kostman observed that Plaintiff had a knee range of motion from 0 to approximately 130° of flexion. Dr. Kostman recommended weight loss and cessation of smoking, cautioning Plaintiff that without compliance in these parameters, he might never heal his osteotomy site, and might experience hardware breakage and refracture. Id. at 1132.

On May 12, 2008, Plaintiff received his first Supartz injection into his left knee. Plaintiff indicated that he was taking Percocet four times daily and that the right knee brace helped his pain, but complained that he would wake in the middle of the night with increased pain. Id. at 1124-25.

On May 20, 2008, Plaintiff visited Dr. Suthar for left-sided facet injections to alleviate his left hip and buttock pain from lumbosacral spondylosis. Plaintiff indicated that he had been taking an additional Percocet to help him sleep at night, causing him to run out of his medications sooner. Dr. Suthar prescribed Vicoprofin for nocturnal pain. Id. at 1122-23.

On May 28, 2008, Plaintiff returned to Dr. Suthar for a second Supartz injection into the left knee. He indicated that there may have been some improvement after the first injection. He also received a Percocet refill. Id. at 1121.

At a follow-up appointment on June 5, 2008, Dr. Miller noted that Plaintiff's right knee was nontender but had limited range of motion (about 75% normal). Dr. Miller indicated that Plaintiff's gait and station were "normal." He continued all of Plaintiff's medications, with refills for Xanax and Percocet, referred Plaintiff to a pain management center, and told Plaintiff to follow up in one month to re-check his blood pressure because he presented with hypertension. Id. at 1113.

On June 24, 2008, Plaintiff returned to Dr. Suthar's office for a third Supartz injection to his left knee. He also received a Percocet refill. Rating his pain at 8/10, Plaintiff also complained of numbness in the hands and asserted that he could only walk for less than a block. He stated that the pain did not wake him up while sleeping. Id. at 1120.

By letter dated July 7, 2008, Dr. Miller informed Plaintiff that he was concerned about Plaintiff's continuing knee pain and need for narcotic medication. Dr. Miller provided a list of pain specialists that could further evaluate and treat Plaintiff's pain. Dr. Miller stated that he would refill Plaintiff's pain medications on a biweekly basis for thirty days, but indicated that lost or stolen medications would not be replaced, and that after August 7, 2008, any further pain medications should be prescribed by the pain specialist. Id. at 1112.

Dr. Miller's notes dated August 29, 2008, indicate that in response to Plaintiff's phone request for a Zoloft refill, Dr. Miller contacted Plaintiff's pharmacy. The pharmacy told Dr. Miller that Plaintiff needed a prescription for Cymbalta (not Zoloft). The pharmacy also informed Dr. Miller that Medicaid was reviewing the prescription, that Plaintiff was not compliant, and that Plaintiff had not been on the medication since May. Dr. Miller called Medicaid to explain why Plaintiff needed to restart the medication; after several calls, a representative from Healthcare USA approved the prescription for one year with a diagnosis of depression. Dr. Miller then informed Plaintiff's pharmacy. Id. at 1111.

On September 21, 2008, Plaintiff visited a pain management center, where he reported that he could not walk far without his knee brace and cane, and complained of occasional numbness in both hands. He asserted that his pain had become "more intense" since it started. He characterized his pain as "continuous" and typically worse midday, evening, and night, and usually better in the morning.

27

On a scale of 1 to 10, Plaintiff rated his current pain at 7, with his worst pain being an 8 and his least being a 6.  Id. at 1088-89.

Plaintiff saw Dr. Poetz on September 23, 2008, to evaluate his bilateral knee complaints.  In a letter dated November 8, 2008, Dr. Poetz concluded that, based upon a physical examination and a review of Plaintiff's past medical history, Plaintiff had a 40% permanent partial disability to the right knee, pre-existing; 45% permanent partial disability to the right knee due to the injury of January 18, 2003; 25% permanent partial disability to the left knee, pre-existing; 30% permanent partial disability to the left knee due to the injury of January 18, 2003; 20% permanent partial disability to the body as a whole due to depression due to the injury of January 18, 2003; 40% partial disability to the left hip; 15% permanent partial disability to the left wrist; 35% permanent partial disability to the left hand and wrist; 40% permanent partial disability to the right hand and wrist; and 15% permanent partial disability to the body as a whole due to hepatitis. Dr. Poetz further asserted that the combination of these disabilities resulted in a total that "exceeds the simple sum by 20%," and that Plaintiff was permanently and totally disabled, and would remain permanently and totally unemployable in the open labor market.  He expressed his belief that "if absent the prior injuries and medical conditions and he was only suffering from the January 18, 2003 injury alone he would still be permanently and totally disabled."  Dr. Poetz recommended, among other things, that Plaintiff avoid heavy lifting and strenuous

activity, as well as prolonged sitting, standing, walking, stooping, bending, squatting, twisting, or climbing.  He also recommended that Plaintiff avoid excessive and repetitive use of the upper extremities, use of equipment that creates torque, vibration, or impact to the upper extremities.  He also recommended that Plaintiff lose weight, discontinue the use of narcotic pain medications, switch to non-narcotic medications with an indication for chronic pain, and seek treatment for COPD, which he developed due to the combination of inactivity and smoking.  He observed that Plaintiff required a right knee total arthroplasty, and indicated that it was more probable than not that Plaintiff would also require a left knee total arthroplasty as well.  (Tr. at 1097-1106.)

In a work restriction evaluation form completed at the September 23, 2008, appointment, Dr. Poetz indicated that in an eight-hour workday, Plaintiff could never lift any of the listed weights (ranging from 5 lbs to 100 lbs) from the floor, that he could occasionally lift 5-10 lbs and 10-20 lbs from a table, that he could occasionally lift 5-10 lbs or 10-20 lbs overhead, and that he could occasionally carry 5-10 pounds less than 30 feet.  He further indicated that Plaintiff could never carry any of the listed weights for more than thirty feet.  Dr. Poetz indicated moderate restrictions regarding unprotected heights, driving automotive equipment, and sustained positions, and mild restrictions regarding side to side bending, rotation of trunk, and being around moving machinery.  Dr. Poetz asserted that Plaintiff should also avoid ladders, stairs, and uneven terrain.  Dr.

Poetz indicated that in an 8 hour day, Plaintiff could stand/walk for 0-2 hours of light work, and could sit for 0-2 hours of light work. He noted that Plaintiff was able to bend and reach occasionally, but was not able to squat, kneel, or climb at all. Id. at 1107-09.

Dr. Suthar referred Plaintiff to Bakul Dave, M.D., another pain management specialist,[10] who examined Plaintiff on October 3, 2008, for continued pain management. Dr. Dave discussed the risks and benefits of using opioids, changed Plaintiff's prescription from Kadian to MS Contin because Kadian was not covered by Plaintiff's insurance, and continued Plaintiff on Percocet three times daily. Id. at 1085-87.

At a follow up visit with Dr. Dave on November 10, 2008, Plaintiff indicated that he occasionally needed to take Percocet four times daily. Plaintiff indicated that activity increased his pain, and described a sedentary lifestyle. Office notes indicate that Plaintiff experienced "good" percent relief from MS Contin and Percocet. Check-box notes indicated that Plaintiff's pain "mildly" interfered with Plaintiff's mood and relations with others, "moderately" interfered with Plaintiff's sleep, enjoyment of life, and ability to concentrate, and "severely" interfered with Plaintiff's general activity and normal work. A check box also indicated that Plaintiff's pain was controlled with his current treatment plan. Id. at

---

[10] The record indicates that the reason for the referral was that Plaintiff had only Medicaid, and not private insurance. (Tr. at 1085.)

1081-84.  Also on November 10, 2008, Plaintiff underwent an ECG and labs under the supervision of Dr. Poetz, who noted that Plaintiff presented with COPD.

**Evidentiary Hearing of February 2, 2009 (Tr. at 1214-34)**

Plaintiff testified that he had filed for unemployment benefits in 2005, 2007, and June 2008, that he was not currently working nor looking for work, and that since 2008 he had been receiving money for medical leave and some for "layoff."  He stated that his employer required that after a lay off he apply for unemployment disability to cover 80% of his former wage, and whatever unemployment disability would not cover, the employer would pay.  Plaintiff also testified that his employer did not require that he look for work during the time he was receiving unemployment benefits.

Plaintiff stated that since the time of his hearing in September 2006, his depression had become worse, and also that the pain in his neck and back had gotten worse.  Plaintiff testified that his son had driven him to the current hearing because he himself only drove three to four times a month.  He would drive farther than ten miles for a doctor's appointment which could be up to 45 miles away.  He testified that he could drive for 45 minutes but that he "sometimes had to stop."  The farthest he could walk at one time was 80 to 100 feet due to his knee pain and shortness of breath.  In the past two and one-half years, Plaintiff had decreased his smoking from one pack to half a pack a day.  He had quit smoking for three months but had to start again because of "nerves" and depression.

31

Plaintiff stated he could stand in line without having something to lean on for ten minutes; pain in his knees and hips prevented him from standing any longer.  Lower back pain allowed him to sit for only 15 to 20 minutes at a time. He used a weight brace on his right knee and a cane to assist his walking, both of which were prescribed by a doctor.  Plaintiff testified that he could climb stairs "at a slow pace," and that he could lift 10 to 15 pounds without any pain.  Plaintiff testified that the last time he had worked was in May 2007, and since then he had been on medical leave before being laid off.  He stated that in May 2007 he tried to go back to work but "I just couldn't do it. . . $24 an hour was kind of hard to give up, so I went back in . . . and I couldn't do it."

Plaintiff testified that he could not bend over to tie his shoes and needed assistance in putting them on.  He had no social activities outside of home besides going to church, maybe once every two months.  He spent his days watching television, did not help with chores around the house, did not care for the yard, and did not go grocery shopping.  Plaintiff described his pain as four to five on a scale of one to ten and a seven after arriving home from the doctor's office.  He stated that the pain was constant and that Dr. Kostman had recommended knee replacements.

Plaintiff testified that he asked for Dr. Smith's help to get him off his narcotic pain medication.  He also testified that he went to drug rehabilitation for five days.  However, Plaintiff was again prescribed pain medication after his knee

surgery in March of 2007.  Plaintiff testified that he had also been to alcohol

rehabilitation in 1990 but stated he did not remember if he had been in court-

ordered drug rehabilitation in 1999.  He also testified that he had five DWIs, the

last one in 1989, and that he had not consumed any alcohol for 12 years.

Plaintiff's counsel stated that Plaintiff was not alleging depression or any

other mental impairment.  The ALJ then commented that Plaintiff was in fact

treated for alcohol dependency in 1999 by court order, and that "I suspect. . .  that

we've got a lot more DWI's and DUI's and rehabs than the claimant was willing to

admit to," and that it was "interesting" that Plaintiff would deny a mental

impairment because he was hospitalized for a suicide attempt and diagnosed with

depression.

### ALJ's Decision of March 26, 2009 (Tr. at 884-98)

The ALJ found that Plaintiff suffered from the severe impairments of

obesity, substance abuse disorder, degenerative joint disease, and the residual

effects of surgery on both knees, but that these impairments singly or in

combination did not meet the requirements of a deemed-disabling impairment

listed in the Commissioner's regulations.

The ALJ determined that Plaintiff had the physical RFC to perform light

work,[11] with the limitations that he could bend only occasionally, and push/pull no

---

[11]    "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting
(continued...)

more than 20 pounds; and, due to his history of substance abuse, had the mental

RFC to perform work unskilled or semi-skilled involving no more than a Specific

Vocational Preparation ("SVP") level of 3-4 (requiring from one to six months of

training). The ALJ found that Plaintiff's statements concerning his symptoms

were not credible to the extent that they were inconsistent with this RFC

assessment.

The ALJ believed that the fact that Plaintiff initially alleged an onset date of

June 3, 2003, when he performed substantial gainful activity until his amended

alleged onset date of November 11, 2005, reflected negatively on his credibility.

She believed that Plaintiff's credibility was further eroded by his testifying at the

second hearing that he participated in drug rehabilitation only once, and when

confronted with evidence that he had been in rehabilitation three times, claiming

that these facts slipped his mind. The ALJ stated that Plaintiff's demeanor during

the hearing persuaded her that Plaintiff was not being truthful about the matter.

The ALJ also believed that the credibility of Plaintiff's allegations of

disabling conditions was undermined by his maintaining a weight of

approximately 300 pounds against medical advice to lose weight to improve his

knee problems, by his filing for unemployment benefits after his amended

---

[11](...continued)
no more than 20 pounds at a time with frequent lifting or carrying of up to ten pounds; and
that might require a good deal of walking or standing, sitting most of the time, and some
pushing and pulling of arm or leg controls.

disability onset date, by his failure to stop smoking, and by his admitted misuse of narcotic pain medication.

The ALJ then explained why she gave little weight to the opinions of Drs. Furukawa, Bacon, and Poetz that indicated that Plaintiff was more limited than reflected in the ALJ's RFC assessment. The ALJ stated that Dr. Furakawa's credibility was "destroyed" because his opinion that Plaintiff was disabled was inconsistent with other physician's notes (namely Dr. Smith's report that Plaintiff experienced 80 % pain relief with treatment, and Dr. Kostman's statement that if Plaintiff lost weight his knee condition would improve significantly), and Dr. Furukawa's own treatment notes (namely, the failure to always report crepitous and decreased range of motion of Plaintiff's knees). The ALJ stated as follows: "There is every reason to believe that [Plaintiff] presented inaccurate information about his prognosis to Dr. Furukawa so that the doctor would support his application for disability. . . . and it appears that [Dr. Furukawa's] report was prepared in order to help [Plaintiff] qualify for disability benefits."

Similarly, the ALJ believed that Dr. Bacon's report that Plaintiff was significantly limited by fatigue was inconsistent with the record and was written because Dr. Bacon was sympathetic towards Plaintiff. Dr. Poetz's opinion that Plaintiff was disabled was "viewed with skepticism" because Dr. Poetz was not a treating physician, whom Plaintiff hired for a disability rating. The ALJ then listed the medical evidence in the record that she relied upon in determining that

Plaintiff could perform light work with the limitations noted in the ALJ's RFC assessment. This list included Dr. Dave's treatment notes which, according to the ALJ, demonstrated that Plaintiff's knee pain was generally well controlled with medication; Dr. Miller's March 13, 2008 report that Plaintiff had a normal gait and a generally normal physical exam; Dr. Kostman's treatment notes which, according to the ALJ, showed that by June 2007, Plaintiff had made a good recovery from the March 2007 tibial osteotomy; and Dr. Furukawa's treatment notes from August 2007 and thereafter indicating a "normal" musculoskeletal system.

The ALJ determined that Plaintiff could not perform his past work because that work was at the medium or higher level, but that he could perform the light/SVP 3-4 jobs identified by the VE at the first hearing.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). "Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). If the claimant does not have a severe impairment or combination of impairments

that meets the duration requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed impairments listed in the regulations. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (heavy, medium, light, and sedentary) listed in the regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as pain or depression, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE.

In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a VE that there are jobs a person with the claimant's vocational factors and RFC could perform must be in response to a hypothetical question which "captures the concrete consequences of the claimant's deficiencies." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001).

Here, the reasons given by the ALJ for discrediting Plaintiff's own credibility are valid. The record supports the ALJ's concern about Plaintiff's drug-seeking behavior. This, however, does not mean that the ALJ's RFC is supported by substantial evidence. Following remand, the Commissioner did not supplement the medical record with a medical examiner's report on Plaintiff's work-related abilities. Rather, whereas the first ALJ found that Plaintiff could only perform sedentary work, a conclusion this Court questioned, the second ALJ found that Plaintiff could perform light work, that is, work at a higher exertional level. Although the Commissioner did not do so, the record has been supplemented by Plaintiff with a new medical report from Dr. Poetz, that indicates that Plaintiff cannot perform light work.

The reasons given by the ALJ for discrediting this medical opinion, and the other medical opinions that reflect similar findings, are not wholly persuasive. The Court notes that the ALJ misread Dr. Furukawa's progress reports from August 2007 (through January 2008) to show a normal musculoskeletal system, when in fact they showed the opposite. And the ALJ highlights no medical

evidence that affirmatively support her RFC assessment that Plaintiff could perform light work with limited bending and pushing and pulling. The Court further notes that relying on the VE's testimony from the first hearing is problematic because that testimony was based on a different RFC assessment than that assessed on remand.

Ordinarily, when a reviewing court concludes that a denial of disability benefits was improper, the court, out of "abundant deference to the ALJ," should remand the case for further administrative proceedings; remand with instruction to award benefits is appropriate "only if the record 'overwhelmingly supports' such a finding." Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000). Here, the Court does not believe that the record overwhelmingly supports a finding of disability, and concludes that the case must be remanded again, this time with specific directions that the Commissioner supplement the record with a medical opinion regarding Plaintiff's work-related abilities. A new decision should then be issued. Given that this is the second remand in the case, this should be done with all due speed.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further development of the medical record and a new decision.

40

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2010.